**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRCIT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **DONALD E. GAMBILL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **No. 14 CV 0572** |
| **v.** | ) |
| | ) **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

<u>**Memorandum Opinion and Order**</u>

MICHAEL T. MASON, United States Magistrate Judge:

Claimant Donald Gambill ("Claimant") has brought a motion for summary judgment (Dkt. 15) seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"). The Commissioner denied Claimant's request for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. §§ 416, 423 and 1383c. The Commissioner has filed a cross-motion for summary judgment (Dkt. 22) asking the Court to uphold the decision of the Administrative Law Judge (the "ALJ"). This Court has jurisdiction to hear this case pursuant to 42 U.S.C. § 405(g) and 1383(c). For the reasons set forth below, Claimant's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted.

## I. BACKGROUND

### A. Procedural History

Claimant filed his applications for DIB and SSI on October 27, 2010, alleging disability as of November 21, 2007 due to COPD, diabetes, glaucoma and neck and

back problems.  (R. 106.)  His claims were denied initially in May 2011, and again upon

reconsideration in October 2011.  (R. 106-115, 126-135.)  Claimant filed a timely

request for a hearing.  (R. 171.)  On October 16, 2012, he appeared with a non-attorney

representative and testified before ALJ Carla Suffi.  (R. 38-93.)  A vocational expert also

provided testimony.  On November 29, 2012, the ALJ issued a decision denying

Claimant's claim.  (R. 18-37.)  Claimant submitted a request for review by the Appeals

Council, which was denied on November 29, 2013.  (R. 9-14.)  Subsequently, the

Appeals Council re-opened the request for review to consider some additional medical

evidence that had been submitted on October 16, 2013.  However, because the

additional evidence post-dated the ALJ's decision, the Appeals Council again denied

Claimant's request for review on February 21, 2014.  (R. 1-5.)  This action followed.

### B.  Medical History

#### 1.  Treating Physicians

**Primary Care Treatment**

Claimant's medical records date back to 2002 when he was treated by Dr.

Christensen for substance abuse problems.  (R. 358.)  He returned to see Dr.

Christensen a couple of times over the next few years for similar issues and general

medical complaints.  (R. 353-56.)

The record also includes treatment notes from Claimant's primary care physician,

Dr. Nasreen Ansari, dating back to February 2008, which demonstrate that he visited

Dr. Ansari on and off for medication management and general medical complaints.  Dr.

Ansari's assessment over the years included COPD, alcohol and tobacco abuse,

glaucoma, back pain, allergies, anxiety, depression and insomnia. She often advised Claimant to stop smoking and drinking alcohol.

Specifically, Dr. Ansari's notes reveal that in February 2008, Claimant was struggling with alcohol, but had sought help. (R. 451.) He was doing "really well" on Spiriva, used for COPD, and Chantix, used for nicotine addiction. (*Id.*) He did not report any pain. (*Id.*) He was given a B12 injection for macrocytosis secondary to alcohol use. (*Id.*) Dr. Ansari recommended he follow up with a mental health treatment center for his alcohol abuse and anxiety. (*Id.*) Over the next few months, Claimant continued on Spiriva with success and was advised to continue with Chantix to curb his nicotine addiction. (R. 449-50.) In July 2008, Claimant complained of back pain, which he rated a four on a ten point scale. (R. 449.)

The record is silent until October 2009, when Claimant returned for medication refills. (R. 448.) He denied chest pain or shortness of breath. (*Id.*) Claimant reported he had a job interview. (*Id.*) On exam, his breathing was slightly coarse and wheezy. (*Id.*) Dr. Ansari assessed COPD, and also prescribed Wellbutrin. (*Id.*) The next month, Claimant complained of a cough, fever, itchy eyes, chest and back pain. (R. 446.) Dr. Ansari assessed a respiratory infection and his medications for glaucoma and COPD were re-filled. (*Id.*) He was "feeling better" the following week but for some neck pain, which he was treating with Flexeril. (R. 445.) He had decreased his cigarette habit. (*Id.*) Dr. Ansari prescribed Trazadone. (*Id.*) In December 2009, Claimant complained of recurrent back pain. (R. 444.)

In March 2010, Claimant reported excessive alcohol use the previous two days and asked to increase his dosage of Wellbutrin for anxiety and depression. (R. 442.)

His other medications for glaucoma and back pain were re-filled as well.  (*Id.*)  He reported doing well the following week when he picked up his medications.  (R. 441.)  During the next few visits for medication refills he reported occasional back pain.  (R. 439-40.)  Dr. Ansari assessed muscular back pain and recommended Tylenol and Flexeril as needed.  (R. 439.)  Claimant also reported he had stopped taking Welbutrin as it was not working.  (*Id.*)  Dr. Ansari again recommended Trazadone for insomnia.  (*Id.*)  In July 2010, Claimant denied chest pains, or shortness of breath.  (R. 438.)  He reported biking five miles daily.  (*Id.*)  His eyes were red from allergies.  (*Id.*)

In August, Claimant's COPD problems had flared up and Dr. Ansari noted increased wheezing and rhonci.  (R. 436.)  She assessed bronchitis and prescribed Levaquin.  (*Id.*)  Claimant was doing well the following week, but complained that his allergies had gotten worse.  (R. 435.)  Dr. Ansari recommended Claritin.  (*Id.*)  In October, he reported he was having difficulty working because of his glaucoma, tinnitus, osteoarthritis of the knee, and back pain, and planned to apply for disability benefits.  (R. 434.)  Dr. Ansari, for the first time, assessed knee osteoarthritis and chronic facial pain status post motor vehicle accident.  (*Id.*)  Claimant continued to complain of back and knee pain at the next two appointments.  (R. 432-33.)  By December 8, 2010, he reported no problems and was very excited for a new job.  (R. 431.)  Claimant returned six months later again complaining of back and knee pain.  (R. 487.)  Dr. Ansari noted he smelled of alcohol.  (*Id.*)

On June 29, 2011, Claimant presented to the emergency room at Oak Forest Hospital with moderate chest and back pain complaints.  (R. 464.)  He described a history of multiple back traumas, such as falling off his bike.  (*Id.*)  He also reported a

history of asthma and COPD.  (R. 465.)  A physical exam was normal except for a low diastolic blood pressure and a bronchial cough.  (R. 465-66.)  Chest imaging showed two nodular densities in the left upper lobe.  (R. 460.)  Further testing was recommended to "rule out abnormal pulmonary nodule[s]."  (*Id.*)  Imaging of the lumbar spine revealed essentially normal results, except for a few small spurs of the upper lumbar vertebral body.  (R. 462.)  There was no narrowing of the intervertebral disk spaces and no fractures or dislocations observed.  (*Id.*)  The examining ER physician assessed back pain and COPD with bronchitis, and advised Claimant to follow up within the week.  (R. 466.)

Claimant followed up as directed, at which time he reported he had lost twelve pounds.  (R. 471.)  He was smoking 15 cigarettes per day, and reported occasional alcohol use.  (*Id.*)  He was taking Bupropion, Spiriva, Trazadone, and Flexeril.  (*Id.*)  The examining physician referred him for a CT scan for the pulmonary nodules issue, recommended Tylenol for his low back pain, and advised he quit smoking.  (R. 471-72.)  He also directed Claimant to continue using Spiriva and start using Atrovent and Qvar for chronic bronchitis.  (R. 472.)

Claimant returned a few weeks later on July 22, 2011.  (R. 468.)  At that time, he admitted to heavy alcohol consumption for the last two months.  (*Id.*)  He reported that he participated in rehabilitation in 2004, and that he was planning to seek help again.  (*Id.*)  He had cut down his cigarette use to 10-12 per day.  (*Id.*)  He reported his back pain had improved with medication.  (R. 469.)  His depression was also stable with medication.  (*Id.*)  A chest CT showed prior granulomatous disease, indicating previous lung infection, but no suspicious pulmonary nodules or masses.  (*Id.*)  His liver enzyme

levels were elevated, likely due to alcohol consumption.  (*Id.*)  The doctor recommended he quit smoking and drinking, and he planned to start Claimant on Albuterol for chronic bronchitis.  (*Id.*)

Claimant also followed-up with Dr. Ansari in July 2011, at which time he rated his pain an eight on a ten-point scale, but reported he was feeling "well" and had stopped drinking.  (R. 486.)  His pain was worsening at his next visit and at some point in 2011 he dislocated his hip.  (R. 484-485.)  He told Dr. Ansari at a follow-up appointment that his hip pain was improving following the dislocation.  (R. 484.)  Dr. Ansari noted that he was walking with a cane.  (*Id.*)  In December 2011, Claimant continued to complain of back and hip pain and was still walking with a cane.  (R. 483.)  Dr. Ansari appeared to assess disc disease and continued to recommend medication.  (*Id.*)

On January 16, 2012, Dr. Ansari completed a physical medical source statement. (R. 488-91.)  She indicated that she had been treating Claimant on and off every month since November 2007.  (R. 488.)  Claimant's diagnoses were listed as COPD, glaucoma, osteoarthritis of the back, depression, tinnitus, hearing loss, and hip pain. (*Id.*)  The prognosis was "fair."  (*Id.*)  She described Claimant's symptoms as daily back/neck pain, worse upon exertion, activity and lifting, and shortness of breath with exertion.  (*Id.*)  She identified the "x-ray done at Oak Forest" as the clinical finding and objective sign of Claimant's impairments.  (*Id.*)  Treatment was listed as Naproxen, Flexeril, and occasionally Vicodin.  (*Id.*)  In Dr. Ansari's view, Claimant's impairments have or could be expected to last twelve months and emotional factors, namely depression, contribute to the severity of his symptoms.  (R. 488-89.)

Dr. Ansari concluded that Claimant could walk two blocks at one time before needing to rest from dyspnea or pain; could stand thirty minutes at a time; could stand/walk less than two hours in an eight-hour day; and sit about four hours in an eight-hour day. (R. 489.) He would need a job that allowed shifting positions at will, as well as five minutes of walking every sixty minutes. (*Id.*) He would require five to ten minute unscheduled breaks every one to two hours due to pain. (*Id.*) Dr. Ansari seemed to indicate that Claimant used a cane, but that she did not feel it was required for occasional standing and walking. (R. 490.) Dr. Ansari also reported that Claimant could occasionally lift ten pounds, rarely twenty pounds, and never fifty pounds; could occasionally twist and climb stairs; could rarely stoop or crouch/squat; and could never climb ladders. (*Id.*) He would likely be off task twenty-five percent or more in a typical workday. (R. 491.) Dr. Ansari also opined that Claimant would likely have more than four absences a month and that his hearing problems and blurry vision from glaucoma would further affect his ability to work. (*Id.*)

In October 2012, Claimant underwent hearing testing following several days of right ear pain. (R. 497.) His history was notable for bilateral downsloping hearing loss and tinnitus for many years. (*Id.*) He did express an interest in hearing aids. (*Id.*) The audiogram revealed unaided discrimination at 72% on the right and 76% on the left at 70 dB bilaterally. (R. 496.) This was noted as unchanged from the previous year. (R. 497.)

**Ophthalmology Treatment**

Ophthalmology records from Dr. Multack at Advocate Medical Group date back to 2007. A treatment note from November 27, 2007 reveals that Claimant suffered from

pigment dispersion syndrome with ocular hypertension. (R. 388.) Dr. Multack opined that he would eventually suffer from pigmentary glaucoma. (*Id.*) He was started on Alphagan eye drops and advised to follow-up. (*Id.*) The following month Claimant had few complaints and his physician discussed intra-ocular pressure and glaucoma. (R. 384.) By January 3, 2008, Claimant's eye drops had been changed and he complained of increased burning, dryness, and redness. (R. 383.) Similar complaints followed in April 2008, at which time he was using Alphagan and Xalatan drops, and in July 2008. (R. 379, 381.) His doctor again assessed pigment dispersion syndrome and also dry eye syndrome. (R. 379.) His complaints continued at the next visit, though he said the drops helped "a lot." (R. 378.)

By late 2008, Claimant's ophthalmologist included pigmentary glaucoma in his assessment. (R. 378.) At that time, he also noted that Claimant had no insurance and was homeless. (R. 377.) Claimant continued to follow-up at Advocate throughout 2009. (R. 372-75.) He still complained of redness, itching, burning and dryness, though he denied pain, floaters, flashers or watering. (R. 373.) On July 7, 2009, he also reported his near vision was blurred. (*Id.*) In October 2009, Claimant told Dr. Multack that he was in a shelter program, but had been looking for a job. (R. 372.) He had been using his eye drops, but had run out at times. (*Id.*)

In January 2010, Claimant reported a mild decrease in visual acuity that fluctuates and was worse on the day of his visit. (R. 371.) He had no other ocular complaints and had been compliant with his medication. (*Id.*) A note from his March 2010 visit indicates that Claimant may have been intoxicated because he was falling asleep during testing. (R. 369.) The following month, Claimant reported increased

dryness and blurry vision both near and far.  (R. 368.)  Drops relieved the dryness, but he had run out two weeks prior.  (*Id.*)  He planned to get glasses.  (*Id.*)  By July 2010, Claimant was complaining of aching eyes if he looked at lights and a fluctuation in his vision if he was not eating well.  (R. 367.)  He was also suffering from seasonal allergies, itchiness and redness, which were relieved with drops.  (*Id.*)  Dr. Multack assessed allergic conjunctivitis.  (*Id.*)

In September 2010, Claimant saw Dr. Scheurer at the Illinois Eye Institute.  (R. 414-17.)  He reported blurry vision both near and far without his glasses, dryness, redness and itching.  (R. 414.)  He reported a history of COPD, depression, anxiety, allergies, as well as hearing loss and ringing in his ears.  (*Id.*)  He had been using his eye drops.  (*Id.*)  Following a full exam, Dr. Scheurer assessed pigment dispersion glaucoma, dry eye syndrome, allergic conjunctivitis, emmetropia with presbyopia, and chorioretinal atrophy.  (R. 417.)  She advised Claimant on the importance of eye medication and follow-up care, prescribed reading glasses and eye drops.  (*Id.*)

The record is silent as to Claimant's vision care until a follow-up visit with Dr. Multack in February 2012.  (R. 492-94.)  He had been using his eye drops as directed.  (R. 492.)  Active problems were listed as acquired heterochromia of the iris, classic migraine with typical aura, dry eye syndrome, and open angle preglaucoma in both eyes.  (*Id.*)  Following an examination, Dr. Multack's assessment of problems remained the same.  (R. 493.)  He advised Claimant to continue with his medication and reminded him of the importance of compliance.  (R. 494.)  Dr. Multack also reported that he completed a form for Claimant's disability application, and that he advised Claimant of

his opinion that "he does not meet the criteria" for disability from the eyes. (*Id.*) The record does not appear to include a completed disability form from Dr. Multack.

## 2. Agency Physicians

On April 11, 2011, Dr. M.S. Patil conducted an internal medicine consultative examination. (R. 453-56.) At that time, Claimant explained that he was in a motorcycle accident in 2003, after which he was in a coma for ten days. (R. 453.) He underwent facial reconstruction with instrumentation, but did not undergo any neck, back or knee surgeries. (*Id.*) Claimant further explained that his knees had been bothering him for years and that he also suffers from pain in his spine. (*Id.*) He described his knee pain as constant with intermittent swelling, with the right knee being worse. (*Id.*) He complained of mild difficulty climbing stairs, walking, or standing for more than fifteen minutes. (*Id.*) He takes Ibuprofen and Cyclobenzaprine as needed, and planned on asking his physician for a cane at his next visit. (*Id.*) He said he was recently fired from Home Depot because he was "too slow." (*Id.*)

Claimant said he was diagnosed with COPD three years prior, but had no related complaints. (R. 453.) He used an inhaler as needed. (*Id.*) He denied respiratory infections, wheezing, dyspnea, chest pain, chronic cough, or skin rashes. (*Id.*) Claimant also told Dr. Patil he has suffered from diabetes and glaucoma since 2009. (*Id.*) He was not taking medication for his diabetes, but was using eye drops regularly. (*Id.*) A month prior, his eye pressure was under control. (*Id.*) He recently lost his prescription eye glasses, but admitted to seeing better when using them. (R. 453-54.) He denied past eye surgery, chronic foot ulcers, polyuria, fever, chills, abdominal pain or GI bleeding. (R. 454.) He described a one pack per day smoking habit for over

twenty years and a history of alcohol abuse on and off for ten years.  (*Id.*)  He had

participated in inpatient rehabilitation in the past.  (*Id.*)  His last drink was the day prior

to the exam.  (*Id.*)

Upon physical examination, Claimant exhibited a normal gait.  (R. 454.)  Dr. Patil

determined that claimant had 20/50 far vision without correction bilaterally and 20/40

vision with pinhole bilaterally.  (*Id.*)  He was able to understand conversational voice at

six feet with mild difficulty.  (*Id.*)  He had a full range of motion of the spine and

extremities apart from a limited range of motion in his knees.  (R. 455.)  Motor strength

was 5/5 in all extremities.  (*Id.*)  He exhibited some difficulty walking on his toes and

heels, and while attempting to squat and rise.  (*Id.*)  An x-ray of Claimant's right knee

revealed mild medial compartmental joint space narrowing and small spurs.  (R. 457.)

Dr. Patil assessed a history of motorcycle accident and hearing loss, diabetes

and glaucoma, a history of COPD, and a history of depression and anxiety.  (R. 456.)

He noted that Claimant was "moderately anxious," but that otherwise his memory and

mentation were normal.  (*Id.*)

On April 29, 2011, Dr. Young-Ja Kim reviewed the record and concluded that

Claimant could lift twenty pounds occasionally, frequently ten; could stand and/or walk,

or sit for six hours in an eight-hour day; could occasionally climb ladders, ropes and

scaffolds; and frequently kneel, crouch, or crawl.  (R. 112-13.)  He found no other

limitations and cited to the report of Dr. Patil in support of his findings.  (R. 112.)

Another agency physician affirmed these findings on reconsideration.  (R. 132-33.)

An agency psychological consultant, Dr. Glenn Pittman, also reviewed the record

in April 2011, at which time he determined that Claimant's mental impairments were

non-severe. (R. 120-21.) He also concluded that those impairments only caused mild limitations of activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence and pace, and no episodes of decompensation. (*Id.*) A second agency consultant reached the same conclusions in October 2011. (R. 140-41.)

### C. Claimant's Testimony

Claimant appeared before the ALJ on October 16, 2012 and testified as follows. He was 54 years old at the time of the hearing. (R. 45.) He completed some college, but did not receive a degree. (R. 46.) He resides with his mother and they "help each other a little bit." (*Id.*) He has a license and drives about three times a week, but usually only short distances during the day because he does not trust himself with his vision and hearing problems. (R. 47.)

 From 1993-1999, Claimant owned an industrial piping company. (R. 50.) He was responsible for outside sales, but also performed a lot of physical work, including lifting up to fifty pounds, loading and driving trucks, and climbing ladders. (R. 51-53.) After selling his company, he continued performing similar duties. (R. 54.) From 2005-2006, Claimant worked as an inside salesman for a valve company, which involved answering phones and running quotes. (R. 54-55.) In 2007, he performed similar duties for a brief period at a pipe fitting company. (R. 56.) Claimant testified that he got these last two jobs as favors from friends in the business, but that they did not work out due to his limitations. (R. 78-79.)

After his alleged onset of disability in 2007, Claimant worked for a couple of weeks at Home Depot. (R. 47.) He was let go because he was too slow, could not lift

things, and had trouble reading small print.  (R. 47-48.)  He also worked briefly in two different maintenance positions, but could not perform the requirements of those jobs, such as kneeling, lifting, and walking.  (R. 48-49.)  He attempted to work for about a month in a customer service position, but was let go when he missed too many days of work.  (R. 49.)  Claimant explained that his ability to perform these recent jobs was further hindered by his hearing problems, and his need to get up and down and eat regularly to keep his blood sugar under control.  (R. 57-58.)

When asked about his vision, Claimant complained that he sees floaters, shadows, and his "cheaters" only sometimes help him read.  (R. 58.)  His blurred vision lasts anywhere from a couple of hours to a day.  (R. 59.)  His ophthalmologist has told him his vision problems are related to his blood sugar levels.  (R. 58.)  As for his hearing, he has difficulty in crowded areas with a lot of background noise.  (R. 59-60.)

Claimant explained that he was diagnosed with COPD a few years prior and it had progressively worsened.  (R. 60.)  He recently presented to the ER for breathing difficulties and was provided albuterol treatment.  (R. 60-61.)  He uses prescription inhalers at home.  (R. 61-62.)  He smokes six cigarettes a day, down from his previous one to two-pack a day habit.  (R. 62.)  He has been prescribed Chantix, but quit taking it while he's been under a lot of stress.  (*Id.*)

Claimant testified about his motorcycle accident in 2003, explaining that he injured his face, neck and spine, and now has twenty-eight screws and five titanium plates in his face.  (R. 63.)  He suffers from pain at the base of his neck, tingling and numbness in his arms, and pain in his lower back, knees and hands.  (R. 63-64.)  His hands get very achy and are difficult to move, especially in the winter.  (R. 64.)

Claimant cannot afford a chiropractor, physical therapy or injections, but he does stretches at home, takes Flexeril and Naproxen for his pain regularly, and Vicodin for extreme pain about three times a week.  (R. 65-66.)  He also takes Trazadone to sleep and for pain relief.  (R. 81.)  His medication relieves his pain, "most of the time," but at times his back pain is so severe even the Vicodin won't help.  (R. 66.)  He suffers side effects such as shakiness, dry throat, stomach aches, and nervousness.  (R. 81.)

Claimant sees his doctor once a month for his physical ailments and depression, which he explained was triggered by his accident and divorce.  (R. 66-67.)  He also feels depressed that he can no longer do things like play golf or go fishing.  (R. 67.) Since his accident, he also has difficulty concentrating and is more nervous.  (R. 63.) He testified that Wellbutrin keeps his depression under control.  (R. 67.)

Claimant testified that the heaviest item he could lift without assistance is a briefcase or lamp due to his neck and back pain.  (R. 68.)  Sitting aggravates his pain and he can sit for a couple of hours before needing to get up.  (R. 69.)  Walking is difficult because his pain and COPD, and he testified that he can walk for a couple of blocks before needing to stop and breathe.  (R. 69-70.)  He can stand in one place long enough to do a load of dishes.  (R. 70-71.)  He walks around the yard and tends to his garden when his pain and the effects of COPD are minimal.  (R. 71.)  He explained that Dr. Ansari prescribed his cane a few years prior to the hearing.  (R. 72.)  On a good day, he will go for a short bike ride and he does take public transportation occasionally. (R. 72.)  He has about two bad days a week when his pain is so bad he sits and watches T.V. all day.  (R. 83.)  He testified that he would be working if he was able to do so because he loves to work.  (R. 81.)

Claimant can cook, bathe, shave and dress himself, though he has at times fallen in the shower due to dizziness, and tying his shoes can prove difficult. (R. 73.) He does light grocery shopping, laundry, and minor repairs around the house, but no longer mows the lawn. (R. 74-75.) He can use a computer if it has a zoom feature, but does not read books. (R. 75-76.) He socializes with friends and goes to church when he is feeling well and has money for gas. (R. 76-77.)

Claimant last had a drink a week prior to the hearing, and was last drunk a year prior to the hearing. (R. 77.) Though alcohol was a problem after his accident and divorce, he no longer views alcoholism as a problem. (R. 78.)

### D. Vocational Expert's Testimony

A vocational expert (the "VE") also testified at the hearing before the ALJ. The ALJ first asked the VE to classify Claimant's past positions as actually and generally performed. (R. 86.) The VE explained that the Dictionary of Occupational Titles ("DOT") does not speak in terms of business ownership. (*Id.*) But she classified Claimant's position of business owner as a manager of professional equipment sales and service under the DOT, which is skilled and sedentary generally, and skilled and medium as performed by Claimant. (*Id.*) She classified his inside sales position as an order detailer, which is light and semi-skilled under the DOT and as performed. (*Id.*)

Next, the ALJ asked the VE to consider an individual of the Claimant's age, education and experience, who can perform light work, except that he is limited to: occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs; can never climb ladders, ropes and scaffolds, or work around unprotected heights and dangerous moving machinery; though can avoid ordinary workplace

hazards such as boxes on the floor, open doors, and approaching people or vehicles; can have no more than occasional exposure to pulmonary irritants; cannot work in direct sunlight or noisy environments; and cannot perform fast paced production work, though he can perform goal oriented work. (R. 87-88.) When asked if the individual could perform Claimant's past work, the VE testified that he could perform the position of order detailer as actually and generally performed. (R. 88.) The VE further explained that the individual could perform other light, unskilled work in the national economy, such as office helper, information clerk, and counter clerk. (*Id.*)

If the hypothetical individual described above could not perform any near or fine visual acuity work, the VE testified that the jobs mentioned would be eliminated because near acuity would be required. (R. 88-89.) The VE explained that he would be unable to identify any jobs that could be performed by an individual without any near visual acuity abilities. (*Id.*)

The ALJ then asked the VE to consider the same individual in the first hypothetical, who was further limited to sedentary work, with the ability to walk and stand for two hours in an eight-hour day, but no more than thirty minutes at a time, and who would need to walk every one to two hours for five to ten minutes. (R. 89-90.) The VE said that the individual could not perform Claimant's past work, but could perform work in the sedentary, unskilled position of office clerk, information clerk, and order clerk. (R. 90.) The VE also testified that if an individual was off task 25 percent of the time and absent four days a month, he could not maintain competitive employment. (R. 91).

## II. LEGAL ANALYSIS

## A.  Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).  We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000)).  This Court will "conduct a critical review of the evidence" and will not let the ALJ's decision stand "if it lacks evidentiary support or an adequate discussion of the issues."  *Lopez,* 336 F.3d at 539 (quoting *Steele,* 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford,* 227 F.3d at 872.  The ALJ must "sufficiently articulate her assessment of the evidence to assure us that she considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning."  *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir.1993) (per curiam) (quoting *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir.1985)).

## B.  Analysis Under the Social Security Act

In order to qualify for benefits, a claimant must be "disabled" under the Act.  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental

impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423 (d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Hatler*, 245 F.3d 881, 885-86 (7th Cir. 2001).  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ applied the five-step analysis here.  At step one, the ALJ determined that despite some recent earnings, Claimant had not engaged in substantial gainful activity since the alleged onset date of disability.  (R. 23.)  Next, at step two, the ALJ identified the following severe impairments: bilateral knee osteoarthritis; COPD; diabetes mellitus, hip bursitis and status post dislocation; sensorineural hearing loss, bilateral pigmentary glaucoma, dry eye syndrome and allergic conjunctivitis; and migraines.  (R. 23-25.)  In the ALJ's opinion, Claimant's mental impairments of depression, anxiety and alcohol abuse did not cause more than minimal limitations. (*Id.*)  The ALJ found, at step three, that the Claimant's impairments did not meet or medically equal any of the Listings identified by the Commissioner as conclusively disabling.  (R. 25-26.)

The ALJ went on to assess Claimant's RFC, ultimately concluding that he could perform light work except that he can only occasionally balance, stoop, kneel, crouch, crawl and climb ramps or stairs; can never climb ladders, ropes, or scaffolds; can never work around hazards such as unprotected heights and dangerous moving machinery; should avoid ordinary workplace hazards such as boxes on the floor, open doors or approaching people or vehicles; can have no more than occasional exposure to pulmonary irritants; must avoid loud work environments and direct sunlight; and cannot perform fast-paced production work, but can perform goal oriented work. (R. 26-29.) Based on this RFC, the ALJ found, at step four, that Claimant could perform his past relevant work as an order detailer. (R. 30.) Alternatively, at step five, the ALJ acknowledged that Claimant could perform other light, unskilled jobs in the national economy, such as office helper, information clerk, and counter clerk. (R. 30-31.) As a result, the ALJ entered a finding of not-disabled. (R. 31.)

Claimant now argues that the ALJ failed to properly consider the opinion of his treating physician; improperly assessed his RFC and credibility; and erred in concluding that he could perform his past work and other work in the economy. We address these issues in turn below and ultimately conclude that the ALJ's opinion is supported by substantial evidence and free from legal error.

### C. The ALJ Properly Considered the Opinion of Claimant's Treating Physician.

Claimant first argues that the ALJ improperly analyzed the opinion of his treating physician, Dr. Ansari. As explained above, among many other things, Dr. Ansari assessed osteoarthritis of the lumbar spine, and concluded in a medical source statement that Claimant would be limited to less than sedentary work. In according Dr.

Ansari's opinion "little weight," the ALJ reasoned that it was excessive in light of the clinical findings, imaging, conservative treatment, and other evidence of record. We find no reversible error in the ALJ's treatment of Dr. Ansari's opinion.

As a general matter, the opinion of a treating physician is entitled to controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). If an ALJ decides not to give a treating physician's opinion controlling weight, "the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R § 404.1527(c). If the ALJ decides to discount the physician's opinion after considering these factors, the decision will stand "so long as the ALJ minimally articulate[d] his reasons – a very deferential standard that [the Seventh Circuit has], in fact, deemed lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (quotations omitted).

The ALJ first acknowledged Dr. Ansari's opinion at step two when she found that claimant did not have a severe medically determinable impairment of osteoarthritis of the lumbar spine. (R. 25.) The ALJ recognized Claimant's complaints of back pain but, citing to the "essentially normal findings" from the June 29, 2011 x-ray of the spine, found there to be no objective evidence to substantiate Dr. Ansari's diagnosis of osteoarthritis of the back. (*Id.*) As a result, although the ALJ found Claimant suffered from a number of severe medically determinable impairments, she did not include osteoarthritis of the back in that list. We see no error in this finding, which admittedly

relates more to the step two analysis as a whole than the treatment of Dr. Ansari's opinion.

At step two, the ALJ is tasked with assessing the medical severity of a claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii). "[A]n impairment or combination of impairments is considered 'severe' if it significantly limits an individual's physical or mental abilities to do basic work activities." Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 at *1. The inquiry at step two has been described as a *de minimis* screening device used to weed out baseless claims. *Newell v. Comm. of Social Security*, 347 F.3d 541, 546 (3d Cir. 2003); *Thorps v. Astrue*, 873 F. Supp. 2d 995, 1004 (N.D. Ill. 2012) (citing *Johnson v. Sullivan*, 922 F.2d 346, 347 (7th Cir. 1990)).

Where, as here, the ALJ found Claimant suffered from other severe medically determinable impairments, we need not dwell on the ALJ's decision at step two to reject Dr. Ansari's diagnosis of osteoarthritis. *See Raines v. Astrue*, No. 06 C 0472, 2007 WL 1455890, at *7 (S.D. Ind. April 23, 2007) ("As long as the ALJ proceeds beyond step two, as in this case, no error could result solely from his failure to label an impairment as 'severe.'"). Instead, we need only ensure that the ALJ properly considered the cumulative impact of all of claimant's impairments, both severe and non-severe, at the subsequent stages of the analysis. *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *6 (N.D. Ill. Feb. 2, 2012) (citing *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003)). We tackle that issue in Part D below.

Getting back then to the ALJ's treatment of Dr. Ansari's opinion, she also considered that opinion when fashioning Claimant's RFC, and ultimately decided to afford it little weight. Again, Dr. Ansari submitted a medical source statement identifying

very extreme limitations in Claimant's ability to perform work-related functions. But, the ALJ concluded that Dr. Ansari's opinion was inconsistent with clinical findings, imaging, and conservative treatment, among other things. Specifically, the ALJ focused on the lack of objective findings in support of the opinion, the essentially normal x-ray results, Claimant's own repeated, contemporaneous reports to Dr. Ansari that he was doing well, as well as Claimant's testimony at the hearing regarding his activities and pain management with medication. These inconsistencies certainly serve as substantial evidence in support of the ALJ's decision to discount Dr. Ansari's opinion. *See Knight v. Chater,* 55 F.3d 309, 313-14 (7th Cir. 1995) ("medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.").

Further, the ALJ recognized that Dr. Ansari never appeared to contemplate more aggressive treatment beyond medication. The ALJ also cited to the results of the internal medicine consultative exam, which revealed minimal problems, and the opinions of the state agency reviewing physicians, which were less restrictive than that of Dr. Ansari. Although the ALJ could not have rejected Dr. Ansari's opinion on these contradictions alone, *see Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003), the inconsistencies further bolster the ALJ's decision on this issue.

On the whole, the Court is convinced that the ALJ properly considered the factors set forth above and her treatment of Dr. Ansari's opinion satisfies the lax standard on review.

**D. The ALJ's RFC Assessment is Supported by Substantial Evidence.**

Next, Claimant argues that the ALJ improperly assessed his RFC because she failed to incorporate his hearing and visual limitations, or any restrictions related to his

lumbar spine limitations.  The Commissioner responds that the ALJ's RFC determination was supported by substantial evidence and free from legal error.  The Court agrees.

The RFC is the most a claimant can do despite his limitations.  20 C.F.R. §§ 404.1545(a), 416.945(a).  In making the RFC determination, the ALJ will consider all of the relevant medical and other evidence in the record, including evidence of impairments that are not severe.  *Id*; *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).  The RFC assessment must contain a narrative discussion describing how the evidence supports the ALJ's conclusions and explaining why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts with such an opinion.  SSR 96-8p, 1996 WL 374184, at **5, 7; accord *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  A court will uphold an ALJ's decision "if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review."  *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012) (citing *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008)).

Here, the ALJ properly considered the limitations with which the Claimant takes issue when she determined he could perform a limited range of light work.  First, with respect to his hearing limitations, the ALJ noted Claimant's testimony that he can use a telephone if he can turn up the volume and, as a general matter, can hear better when there is less background noise.  The ALJ reviewed the results of the audiogram, showing discrimination levels above 70% in both ears, and also referenced Dr. Patil's note that Claimant was able to understand conversational voice at six feet with only mild difficulty.  Further, the ALJ commented on her own personal observation that Claimant

could hear her questions at the hearing "as long as [she] spoke up." (R. 29.) Based on this evidence, the ALJ concluded that Claimant must avoid loud noise environments.

According to Claimant, because he exhibited difficulty hearing in even presumably quiet settings, the ALJ should have explained how she determined he could hear instructions in moderately noisy work environments, but not in loud environments. The Court disagrees. The ALJ considered all of the evidence related to Claimant's hearing limitations and supported her ultimate conclusion on this issue with substantial evidence. Other than his own testimony that he watches TV with headphones and sometimes has difficulty hearing in a noisy grocery store, Claimant cites to no other significant evidence supporting how his hearing limitations would further erode his RFC.

The ALJ's assessment of Claimant's visual limitations is also supported by substantial evidence. The ALJ considered Claimant's ophthalmology records, which showed he often denied floaters, pain, flashers or watery eyes. The ALJ also noted that Claimant reported that eye drops help to relieve any itchiness and redness. Though he testified to floaters, shadows, and pools of light at the hearing, he explained that "cheaters" sometimes helped, and the ALJ noted that he had told Dr. Patil the same thing. The ALJ reviewed the results of his visual acuity examinations, and ultimately concluded that the results failed to support greater limitations than reflected in the RFC. Those limitations included avoiding direct sunlight, unprotected heights, moving machinery and fast-paced production work. Having properly reviewed the evidence of record regarding Claimant's visual limitations, we fail to see how the ALJ's assessment on this issue falls short.

Claimant also argues that the ALJ failed to include additional restrictions related to the osteoarthritis of his lumbar spine.  As explained above, the ALJ concluded at step two that the evidence of record, including Dr. Ansari's diagnosis, did not support a finding that Claimant had the medically determinable impairment of osteoarthritis of the lumbar spine.  Despite this finding, the ALJ went on to properly consider Claimant's complaints of back pain and his alleged limitations resulting therefrom.

On this point, the Claimant again takes issue with the ALJ's decision to give Dr. Ansari's opinion little weight.  But, we have already concluded above that the ALJ's reasons for discrediting that opinion were sound.  Otherwise, the record does indeed include repeated complaints of back pain, notes from Dr. Patil indicating Claimant had some difficulty squatting, rising, and heel/toe walking, and some additional testimony from Claimant regarding his limitations.  On the other hand, as the ALJ points out, there is also evidence of somewhat successful pain management with medication and overall conservative treatment.  The ALJ properly considered all of this evidence, as well as the opinions of the reviewing physicians and Claimant's activities of daily living.  She ultimately concluded that, despite his back pain, Claimant could perform occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps or stairs.  We find no reversible error in this conclusion.

### E.  The ALJ's Credibility Assessment is not Patently Wrong.

Claimant also takes issue with the ALJ's assessment of his credibility, arguing in part that she failed to comply with SSR 96-7p.  At the outset, we note that the Social Security Administration (the "Administration") has recently updated its guidance about evaluating symptoms in disability claims.  *See* SSR 16-3p, 2016 WL 1119029 (March

16, 2016).  The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character."  *Id.* at *1.  Though SSR 16-3p post-dates the ALJ's hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law.  *Pope v. Shalala*, 998 F.2d 473, 482-483 (7th Cir. 1993), overruled on other grounds by *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999).

As before, under SSR 16-3p, the ALJ must carefully consider the entire case record and evaluate the "intensity and persistence of an individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities."  SSR 16-3p, 2016 WL 1119029 at *2.  The ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.  *Goble v. Astrue*, 385 Fed. App'x. 588, 593 (7th Cir. 2010).  However, the ALJ need not mention every piece of evidence so long as she builds a logical bridge from the evidence to her conclusion.  *Id.*  In making a credibility determination, the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence."  *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995).

Rather, SSR 16-3p requires the ALJ to consider the following factors in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms, (4) the type, dosage, effectiveness and side effects of medication; (5) any treatment, other than medication, for relief of pain or other

symptoms; (6) any measures the claimant uses to relieve the pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 2016 WL 1119029 at *7.  Consequently, we will only reverse the ALJ's credibility finding if it is "patently wrong."  The ALJ's credibility determination is patently wrong if it lacks "any explanation or support."  *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

Here, though not perfect, we cannot say that the ALJ's assessment of Claimant's symptoms was patently wrong.  Standing alone, some of the ALJ's statements on this issue might be cause for concern.  For example, a lack of objective medical evidence is not enough on its own to discredit a Claimant's allegations of symptoms and limitations, *see Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015), and courts have frowned upon the boilerplate language inserted by the ALJ here, *see Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012).  Similarly, a lack of a prescription for a cane, which the ALJ pointed out here, cannot truly serve to discredit a claimant because a prescription is not required for a cane.  *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

In any event, despite a few concerning statements, on the whole, we cannot say that the ALJ's opinion lacks any explanation or support, where she went beyond just the boiler plate language, and considered the factors set forth above.  Not only did the ALJ point out the lack of objective medical evidence supporting claimant's allegations, she also cited to the relatively routine treatment, which included medication management, but no recommendation for surgery.  She considered Claimant's repeated contemporaneous reports to Dr. Ansari that he was doing well, his own testimony that medication often treats his pain, and a variety of reported daily activities, among other

things.  *See Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("An ALJ should

consider elements such as objective medical evidence of the claimant's impairments,

the daily activities, allegations of pain and other aggravating factors, "functional

limitations," and treatment (including medication).").  On the whole, the ALJ has built a

logical bridge from the evidence to her conclusion and her assessment of Claimant's

symptoms is supported by substantial evidence.

### F.  The ALJ's Step Four and Five Decisions are Supported by Substantial Evidence and Free from Legal Error.

Lastly, Claimant argues that the ALJ erred by concluding at step four that he

could perform his past relevant work as an order detailer, and by concluding

(alternatively at step five) that there were other jobs she could perform in the national

economy.  According to Claimant, the ALJ improperly determined that he could perform

half of the composite job described by the ALJ, and failed to properly consider his visual

limitations and proximity to the next age category under the Medical-Vocational

Guidelines (the "Grids").

As an initial matter, we note that Claimant's arguments on these points are

cursory.  In any event, contrary to Claimant's argument regarding the composite job,

Claimant testified to working in an inside sales position, separate from and after his

position as a business owner.  The ALJ appears to have relied upon his experience in

that separate inside sales position (as opposed to his experience in the composite job),

in finding he could perform that past relevant work.  Further, after finding that Claimant

could perform his past relevant work, the ALJ was not required to address any

borderline age situation at step four under the Grids.  *See Gann v. Colvin*, No. 14-CV-

198, 2015 WL 1486583, at *5 (W.D. Wis. Mar. 31, 2015) (pointing out that pursuant to

20 CFR Pt. 404, Subpt. P, App. 2, § 200.00(a), the Grids apply where "the individual's impairment(s) prevents the performance of his or her vocationally relevant past work.").

Lastly, as the Commissioner points out, even if we found an error at step four, such error would be harmless, as the ALJ properly went on to conclude, at step five, that Claimant could perform other work, including office helper, information clerk, and counter clerk. Though Claimant again takes issue with the ALJ's treatment of his visual limitations, we have already concluded above that the ALJ properly considered and accounted for those limitations.

## III. CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment is denied and the Commissioner's cross-motion for summary judgment is granted. It is so ordered.

_____
**Michael T. Mason**
**United States Magistrate Judge**

**Dated: August 5, 2016**